1   UNITED STATES DISTRICT COURT

2   WESTERN DISTRICT OF WASHINGTON

3   AT TACOMA

4
    UNITED STATES OF AMERICA,      )   Docket No. CR02-6067FDB
5                                  )
            Plaintiff,             )   Tacoma, Washington
6                                  )   June 13, 2003
        vs.                        )
7                                  )
    MICAH J. GOURDE,               )
8                                  )
            Defendant.             )
9                                  )
    _____)
10

11
            TRANSCRIPT OF SENTENCING PROCEEDINGS
12      BEFORE THE HONORABLE FRANKLIN D. BURGESS
            UNITED STATES DISTRICT JUDGE.
13

14
    APPEARANCES:
15
    For the Plaintiff:          JANET FREEMAN
16                              Assistant United States Attorney
                                700 Stewart Street, Suite 5220
17                              Seattle, Washington  98101-1271

18  For the Defendant:          COLIN FIEMAN
                                Office of the Public Defender
19                              1331 Broadway, Suite 400
                                Tacoma, Washington  98402
20
    Probation Department:       DONALD MOON
21
    Court Reporter:             Teri Hendrix
22                              Union Station Courthouse, Rm 3100
                                1717 Pacific Avenue
23                              Tacoma, Washington  98402
                                (253) 593-6545
24
    Proceedings recorded by mechanical stenography, transcript
25  produced by Reporter on computer.

```
 1                FRIDAY, JUNE 13, 2003 - 9:00 A.M.

 2                               * * *

 3         THE CLERK:  CR02-6067, United States of America

 4   versus Micah J. Gourde.

 5         Counsel, please make your appearances for the record.

 6         MS. FREEMAN:  Good morning, Your Honor.  Janet

 7   Freeman on behalf of the United States.

 8         MR. FIEMAN:  Good morning, Your Honor.  Colin Fieman

 9   for Mr. Gourde.

10         THE COURT:  All right.  This matter is on today for

11   sentencing.  What I have received in this regard is the

12   presentence report, the government's sentencing memorandum,

13   and the defendant's sentencing memorandum, along with a motion

14   as to this defendant being released pending the appeal matter.

15      I received this morning a letter that evidently didn't

16   make it into the presentence report, from a Shelley Anderson,

17   and it refers to Mr. Gourde.  I believe, Mr. Fieman, as to the

18   presentence report, there was an updated or revised sentencing

19   recommendation from the probation department.  All these

20   documents that I have mentioned, everybody has received a copy

21   of them and all of that?

22         MR. FIEMAN:  Yes, Your Honor.  I would just note for

23   the record that in terms of the revised sentencing

24   recommendation, there was a typographical error that I

25   confirmed with Mr. Moon.  It does say custody recommendation
```

1    is 21 months.  Then in the paragraph where it states

2    respectfully recommend the sentence be imposed as follows, it

3    says that the defendant should be committed to the custody of

4    the BOP for a term of 30 months.  I believe the 30 months, of

5    course, was simply a typographical error, and the

6    recommendation is 21 months.

7              THE COURT:  It would appear, Mr. Moon, do you agree

8    with that?

9              PROBATION OFFICER:  Yes, Your Honor.

10             THE COURT:  It is a change from the revised --

11             MR. FIEMAN:  Correct, Your Honor.

12             THE COURT:  So that should read 20 months.

13        All right, anything else?  What about the presentence

14   report itself, anything from a factual standpoint that needs

15   correcting in that regard?

16             MR. FIEMAN:  No, Your Honor.

17             THE COURT:  All right.  Then I believe that we are

18   ready for sentencing?

19             MR. FIEMAN:  Ready to proceed, Your Honor.

20             THE COURT:  All right.  Ms. Freeman, I will start

21   with you.

22             MS. FREEMAN:  Before we begin, Your Honor, I think I

23   heard you say you had a letter from Shelley Anderson.

24             THE COURT:  You didn't receive a copy of it?

25             MR. FIEMAN:  I am sorry, this was one that was in Don

1   Moon's file which he brought directly over.  It is from his

2   aunt.  You certainly should see a copy of it.  I don't have a

3   copy of it either.  It went directly to probation.  I did ask

4   Mr. Moon to provide a copy directly to you.

5           THE COURT:  Would you like to see a copy?  It is from

6   his aunt speaking on his behalf as to his character and that

7   kind of thing, so if you'd like to make copies of it, we can

8   do that and you can each have a copy.  It is the basic letter

9   saying nice things about Mr. Gourde.

10          MS. FREEMAN:  I think simply to keep my record

11  complete, I would like a copy of that.

12          THE COURT:  Mr. Fieman, do you have a copy?  I don't

13  either.

14      Why don't you make a couple copies so you can each have

15  that.

16      Do you want me to proceed while we are waiting on the

17  letter?

18          MS. FREEMAN:  I think we can go ahead and proceed.

19  If I need to add something in addition after receiving the

20  letter --

21          THE COURT:  Okay.  Go ahead.

22          MS. FREEMAN:  Your Honor, I do concur with the

23  recommendation of the pretrial -- excuse me, with the

24  probation office.  I have recommended the low end of the

25  range, or I should say the revised range once the acceptance

1   of responsibility adjustment was made.  That low end of the
2   range is 21 months in this particular case.
3       I do not agree with the downward departure and with the
4   position that has been taken by Mr. Gourde in the sentencing
5   memorandum provided by his attorney.  There appeared to be
6   several bases upon which he is making a motion for downward
7   departure, and I would like to address each of those in turn.
8           THE COURT:  All right.
9           MS. FREEMAN:  With respect to the first claim that
10  his offense conduct falls outside the heartland, Mr. Gourde's
11  attorney relies on the case of United States v. Parish.  As I
12  understand, this was a case that was submitted by the Ninth
13  Circuit in 2002, as I recall.  In the event the Court does not
14  know, the government did petition for a rehearing en banc in
15  that case, and my understanding is that was denied.
16      Sp in any event, I looked to the Parish case, however, and
17  I can distinguish that case factually from our case here.  I
18  point out that the District Judge in the Parish case seemed to
19  rely on two bases upon which to make a downward departure.
20      One was the claim that the conduct was outside the
21  heartland, which I will address in a moment.
22      The second basis was based upon a belief that that
23  particular offender would be susceptible to abuse based on his
24  physical characteristics.  Then the Ninth Circuit went on to
25  talk about the physical characteristics of the defendant in

1    that case and attempted to understand what it was that had

2    concerned the District Court so much, and further concluding

3    that the District Court was in the best position to observe

4    the demeanor of a particular defendant as well as the physical

5    characteristics.

6         So the record is not fully complete in the Parish case, as

7    far as I can tell, based on what that demeanor might have been

8    or what it was, but it appeared to be of grave concern to the

9    District Judge in that case.

10        We are not hearing that here.  I don't see anything about

11   this particular case, about the physical characteristics or

12   about the demeanor of the defendant in this case which seems

13   to fit within the confines of the concerns of the District

14   Judge in Montana or the Ninth Circuit for that matter.

15        I think that's important because the Ninth Circuit placed

16   much reliance on the susceptibility to abuse, as apparently

17   did the District Court, and we just don't have that issue

18   here, Your Honor.

19        Furthermore, in the Parish case there was no evidence

20   presented that the defendant had actively downloaded or stored

21   any images of child pornography.  There was also evidence

22   presented that there had been no storing of information or

23   filing of pornographic images in certain manners and means and

24   that type of thing.

25        Well, here, we do have evidence that there was an active

1  download of images in this particular case.  As the Court

2  might recall, we had a lengthy suppression hearing in which

3  the FBI agents testified, and it was brought out at that time

4  that the defendant became a subscriber to a web site which did

5  offer child pornographic images.  As I recall, the

6  introductory page to the web site offered nude images of girls

7  ranging between the ages of 12 and 17.

8      So unlike the Parish case, or at least unlike evidence

9  that was presented or not presented in that case, the

10  defendant here did actively download images, and there were

11  approximately 100 or so such images in the allocated space

12  which, as I understand, indicates an active download on a

13  computer system.

14      Under the allocated space, which seems to be akin to

15  the Parish matter, which referred to the temporary Internet

16  access files, in Mr. Gourde's case there were hundreds,

17  hundreds of images, which included full scale images as well

18  as thumbnail images.

19      Unlike Parish, the defendant paid to get the images here

20  by joining this web site which required a monthly access fee.

21  The evidence presented shows he began the membership in or

22  around November 2001 and continued through on or about January

23  21, 2002, when the web site was taken down by a federal search

24  warrant in Iowa.

25      Furthermore, in the Parish case, there was expert

1  testimony presented by a doctor or psychologist of some kind

2  who testified for the sentencing court.  Based on that expert

3  testimony, the doctor opined that that particular defendant

4  did not fall within the heartland of the child pornography

5  type possession cases, and that he did not fall within the

6  heartland based on the doctor's work with other sexual type

7  offenders that were in the federal prison area in that part of

8  Montana.

9      Here, we don't have any such testimony, and it is not

10  being presented.  It also plays into the Stevens case, which

11  was cited by Mr. Fieman in his brief, and the Parish court

12  also made reference to the Stevens case.  As this Court may

13  know, the Ninth Circuit did not affirm a downward departure in

14  the Stevens case.  Instead, the Ninth Circuit found that the

15  downward departure had been made for impermissible reasons and

16  made clear that there needed to be some kind of a comparison.

17  In order to find whether a case is outside the heartland of a

18  particular case, the sentencing court needs to make a

19  determination that the offense conduct falls outside the

20  heartland.

21      In the Stevens case, there was no such evidence or

22  information that was presented to the District Court, and

23  therefore that was one of the bases upon which the District

24  Court improperly granted a downward departure in Stevens.

25      So for those reasons, I think the Parish case can be

1    distinguished from this case at hand.

2        I would like to follow through with the Stevens case as

3    well, because I think it is instructive on downward

4    departures.  The Ninth Circuit spent most of that opinion

5    giving the guidance to the District Court on what the District

6    Court may or may not rely upon when viewing this decision of

7    heartland and whether or not a certain offense conduct falls

8    outside the heartland.

9        Again, I point out that the Ninth Circuit made clear that

10   there needs to be a comparison with the other offenders that

11   are similarly situated.

12       I don't know how many cases that have been put before this

13   Court.  I am sort of new to this area of child pornography

14   myself, although I have been a prosecutor for many years, but

15   it seems that many of the cases that I am now working on and

16   participating in the investigations and preparing for charging

17   documents, they seem to involve the same kind of conduct based

18   on my experience.

19       In other words, we are seeing a lot of computer usage with

20   respect to the Internet, with respect to downloading and

21   pursuing these web sites in which the access to these child

22   pornographic images are gained.

23       So based on my experience, I don't really see anything

24   about this case that's taking it outside of these other

25   offenders that I am prosecuting.  In fact, this offender seems

1  to be similarly situated to the other ones.

2      There was another point I wanted to make about the <u>Stevens</u>

3  case, and as I keep talking it will probably come to me.   But

4  in any event, I will move along to the other bases presented

5  in the defense sentencing recommendation.

6      I do oppose a downward departure based on aberrant

7  behavior.   This was not a one-time deal.   Again, we had at

8  least 100 images in the allocated space.   We had hundreds of

9  images in the unallocated space.   We know this defendant was a

10  subscriber to this particular web site for a two-month period.

11      Again, I remind the Court that this was a paid

12  subscription which was automatically renewed each month, and a

13  person continues to be a member to that web site unless they

14  took active steps to remove themselves, and there was no

15  evidence of that here.

16      Based on the number of images, based on the fact that he

17  actively downloaded images, based on the fact that he did pay

18  a subscription for these images, I don't think that fits into

19  the description of aberrant behavior because there was

20  continued use by the facts and circumstances that I have

21  presented to the Court.

22      On the question of post-offense rehabilitation, I oppose

23  that request as well.   From what I have seen in the sentencing

24  recommendation, it appears that Mr. Gourde is participating in

25  some kind of counseling, dealing with perhaps some alcohol

1  related issues.  But when I think of the post-offense

2  rehabilitation, I think of rehabilitating from the offense

3  conduct in question, and the offense conduct in question seems

4  to indicate some kind of sexual related issues.

5      I am not an expert, and I am not trying to pretend to be

6  one, Your Honor, but there again seems to be some kind of

7  issues, and I don't hear that the defendant has been

8  participating with any counseling in relation to sexual

9  deviancy issues or some type of sexual treatment or things

10  along those lines.  I am not seeing that kind of supposedly

11  post-offense rehabilitation going on.

12      As I said, when I think of a post-offense rehabilitation,

13  I think more along the lines of what is being rehabilitated

14  from the particular offense conduct in question.  That again,

15  just does not seem present in this particular case.

16      All things considered, I believe that the recommendation

17  by the government and the probation office is fair.  As I

18  pointed out in my sentencing memorandum, we did locate some

19  images of what appeared to be four to five to six-year old

20  kids, and the guidelines seem to indicate that there is an

21  enhancement that can be applicable for minors under the age of

22  12.  I am not pursuing that.  I am going to err in favor of

23  the defendant and give him the benefit of the doubt.  But I

24  make the Court aware of this information so that the Court is

25  wholly aware of the entire conduct in this particular case.

1     Furthermore, there has just been -- the evidence that has

2  been presented to the Court has been evidenced by way of the

3  suppression hearing, by way of the findings of the presentence

4  report and information that has been passed along in the

5  sentencing memoranda.

6     What I am saying is that the Court just doesn't have

7  evidence really one way or another about what, if anything, in

8  particular Mr. Gourde might have done with the images and the

9  unallocated space of his computer, because once there was a

10 guilty plea in the case there was no need for either party to

11 pursue computer forensics any further.

12    So I am anticipating that my colleague, Mr. Fieman, of

13 whom I have tremendous respect, will proffer some kind of

14 argument to the Court that there was no evidence that

15 Mr. Gourde was communicating with other minors or that there

16 was no particular organization or filing of certain images.

17    All I am suggesting to the Court is that we really don't

18 have evidence just one way or the other that's clearly set

19 forth on this point.  But what we do have evidence of, as

20 presented at the suppression hearing, is that there were

21 images that were actively downloaded by Mr. Gourde.

22    Furthermore, the point came to me with respect to the

23 Stevens case.  The Stevens case seemed to think that because a

24 computer was involved in that case, that provided for an

25 enhancement under the sentencing guidelines.

1      The Stevens court seemed to indicate that that

2  enhancement in and of itself seemed to weigh against issuing a

3  downward departure just by virtue of the fact that the

4  Sentencing Commission believed that some kind of enhancement

5  was warranted by the use of a computer in a particular case,

6  and I wanted to point that out as well to the Court.

7      Unless there are further questions by the Court or any

8  questions by the Court, I am finished with my allocution.

9  However, I also wish to point out that pursuant to the terms

10  of the plea agreement, the parties have agreed to a criminal

11  forfeiture.  I have prepared today a preliminary order of

12  forfeiture, and that forfeiture pertains to the Western

13  Digital hard drive, which was part of the computer in this

14  case, as well as the pornographic magazines and the visual

15  images of minor children engaged in sexually explicit conduct.

16      I have shared this preliminary order with Mr. Fieman,

17  and my understanding is that he has no objection to it.  Thus,

18  when we get to that part of the proceedings, I wish to present

19  this preliminary order to the Court.

20          THE COURT:  All right.

21          MS. FREEMAN:  Thank you.

22          THE COURT:  Mr. Fieman.

23          MR. FIEMAN:  Thank you, Judge.

24      Judge, if I may address you from here, it is just a

25  little crowded.

1     Your Honor, the law that the Court can rely on for
2   departure is set out in the memo.  Clearly, it is a matter
3   entirely for your discretion.  I don't think it's a question
4   whether the law allows for departure but whether Micah
5   deserves one.  I think there are some remarkable aspects to
6   Mr. Gourde and the way he has handled his case.
7     I do want to note, however, and I think it is important
8   that the record reflect that we do not agree, and that there
9   is based on the suppression hearing and the statement of
10  facts, there is no evidence that there was active downloading
11  in this case.
12    Indeed, the whole premise of the suppression hearing, as
13  Your Honor very well recalls, was the idea that somebody could
14  visit a web site, have images transmitted to temporary caches
15  or end up being in what's called unallocated space and be
16  charged with possession.
17    Whatever the ruling was, the facts and the whole issue is
18  that there was no evidence that Mr. Gourde had actively
19  downloaded or stored or otherwise put in the type of
20  intentional behavior that is normally seen in these cases.
21    So I need to note that for the record because we very much
22  objected to that characterization, and of course the statement
23  of facts in the plea agreement does not contain any concession
24  as to active downloading.
25    Leaving that aside though, what we are really here to

1   determine is whether or not, I believe, Your Honor, Mr. Gourde

2   merits a downward departure.  I have laid out, I think, a

3   number of compelling reasons why I think Micah is an

4   exception.

5       Frankly, Your Honor, and I don't say this easily, I have

6   not stood before the Court in any jurisdiction with a client

7   and been able to say to the Court that I have seen a young man

8   take responsibility and takes measures to turn his life around

9   to the extent that Micah has.  I, frankly, as an attorney find

10  it remarkable.

11      Before I met Micah, before we discussed the charges

12  against him, before he ever appeared in court, he took the

13  opportunity that these charges presented to do one of two

14  things.  He could either seek to evade responsibility, go

15  backwards, refuse to accept what the reality of this situation

16  was, or he could use it as an opportunity for change.

17      He has been out for over a year now, since the search

18  warrant was executed.  Frankly, it is amazing to me, and I

19  think Micah is in better shape and a much better human being

20  as a result of going through this process.

21      Now, I often would come to the Court and say well, I hope

22  that's the result of my client, or I have seen signs of

23  change, or believing that a client was a good prospect for

24  rehabilitation.  I have not stood before the Court and had a

25  client where I feel they have already demonstrated a

1    remarkable change in their life to the extent that Micah has.

2        He stopped drinking on his own, cold turkey, after this

3    search warrant was executed.  That is a difficult thing for

4    anybody to do.  It is difficult, particularly under stressful

5    circumstances.  And for him to realize that he needs to start

6    reforming and getting control of his life to that extent,

7    based on the shock of having his computer seized and facing

8    criminal charges, I think says a great deal about him.

9        He, without consulting with any attorneys, without coming

10   to the Court or realizing the consequences, he went out the

11   following month after the search warrant was executed, found

12   his own counselor, has been paying for counseling on a regular

13   basis out of his own employment which he has maintained since

14   the age of 18 without a break, and that counseling is

15   extensive.

16       It is not directly alcohol related at all.  In fact, it

17   deals with every issue in Micah's life, including any issues

18   regarding controlling his behavior and using a computer, any

19   sexual issue he may have.  This is comprehensive

20   psychotherapeutic counseling.  He started himself on that, and

21   he's maintained it for a year.  And there is, of course, a

22   letter to the Court that says he has made good to excellent

23   progress in that regard.

24       This is not a situation where I am coming to the Court and

25   saying well, Your Honor, I have a client that deserves a break

1  because he's amenable to treatment, and possibly we substitute

2  treatment for part of a jail sentence we'll see some progress.

3  This is somebody who has used the last 12 months to make that

4  progress on his own.  That, frankly, to me is truly

5  exceptional.

6      There is one additional letter which I just received that

7  I would ask to submit to the Court.  A copy has been provided

8  to Ms. Freeman.  It is from Micah's employer, David Kernitch.

9  I have a copy to submit to the Court.  I would just like to

10  read one part of this.

11      Mr. Kernitch has known Micah since the late 1980s when

12  Micah was in high school with Mr. Kernitch's older daughter.

13  Mr. Kernitch is a manager of the west region for

14  Offshore-Inland, which is a national company based in Mobile.

15      Micah has worked there since the age of 18 full-time,

16  frequently with extensive overtime, or its predecessor

17  company.

18      This is just part of what Mr. Kernitch had to say.  He

19  describes Micah as a person with a very high level of

20  maturity, honesty, self-being and morality.

21      He goes on to say:  As I get older, I don't see these

22  qualities being demonstrated by people of this age and in some

23  cases people older than he is.  I have quite a high regard for

24  this young man and consider Micah a very good friend.

25      When my wife and I go on vacation and leave town, Micah

1   lives at the house making sure our dogs and house are taken

2   care of until we return.   No matter what I might need, I know

3   if I call Micah for help he will be there for me.   This is the

4   type of integrity that he has used.   I would trust Micah with

5   anything I have.

6        Then it closes with what I think is another truly

7   remarkable statement.   Mr. Kernitch says that I was blessed

8   with two wonderful daughters, but if I would have had had a

9   son, I can only hope he would be like Micah Gourde.

10       Now, Mr. Kernitch deals in a rough and tumble industry

11   maintaining offshore equipment.   He has seen a full array of

12   characters and certainly is not a man to take lightly the

13   statement of character like this.

14       He's also fully aware of the charges that Micah is facing.

15   He's been very supportive of that.   He knows he's in court

16   today.   He knows what he is facing.   He knows why he is here,

17   and he submitted this letter yesterday on behalf of Micah.

18       I think for somebody to do something like that when

19   somebody is facing these type of charges, knowing what they

20   are facing, it is certainly a stronger testament than I can

21   make, even knowing Micah for the short period I have.

22       If I may hand this up to the Court for the full record.

23       So, Your Honor, I think Micah would like the opportunity

24   to address the Court himself, and I think he can say anything

25   for himself much better than I can.

1       I would note that Micah's parents have been here.  They

2  have been remarkably supportive through this, and I think he

3  considers himself blessed to have the parents he does and the

4  family support he has.  I think that's gone a long way over

5  the past year to get him to the point where he is today.

6       Oddly enough, Your Honor, whatever your sentence is, I

7  think Micah sees this as a positive turning point in his life.

8  He's accepted responsibility.  He is going to accept, of

9  course, whatever sentence you impose.  I don't think, in some

10  respects, the sentence is truly significant.

11       I think the fact that he has got to this point today, to

12  the extent of beating his alcoholism and taking responsibility

13  for his life and having a future to look forward to, I think

14  is going to be very, very positive, makes him a strong and

15  worthy individual.  And I am proud to represent him in this

16  case.

17            So, Your Honor, Mr. Gourde can address the Court.  I

18  have nothing further to say.

19            THE COURT:  Okay.  Mr. Gourde.

20            THE DEFENDANT:  Good morning, Your Honor.  My name is

21  Micah Gourde.  I am 26 years old.  I grew up with a very

22  loving and supportive family in Castle Rock, Washington.  I

23  have got an excellent relationship with them.  They have stood

24  by me, beside me through all this.  And I can't ask for

25  anything more than that from them or anybody else.

1       I have got a lot of very, very close friends.  You heard
2   from one of them, my boss, who wrote you that letter.  I grew
3   up with his daughter and am very fortunate to know all of
4   them.

5       I would like to start this actually by saying that I am
6   sorry that I have allowed myself to get into this position.  I
7   fought with alcohol for quite a few years.  And I fell into, I
8   don't want to call it a trap, I don't know what I could call
9   it.  I simply digressed into turning into a person that I no
10  longer knew anymore.

11      I have got no reasonable explanation for my behavior.  All
12  I can do is say I am sorry and I intend for it to never happen
13  again.  I stopped drinking.  I intend to never drink again.

14      Colin hit the nail on the head when he says he thinks I
15  see it as a turning point, and I do actually see it as a
16  turning point.  Whatever sentence is imposed on me is simply a
17  means to an end.

18      I am a better person today than I was a year ago, or two
19  or three or five years ago.

20      Five years from now, I am going to be an even better
21  person because this entire thing is going to be behind me.  I
22  have learned a lot from it.  I have learned a lot about
23  myself.  I have learned a lot about my family.  I have learned
24  a lot about my friends.  I have learned a lot about life in
25  general.

1      I am at a point in my life that I've seen people 40, 50,

2   60 years old not reach yet.  I have known alcoholics that have

3   gone on to their mid 40s and mid 50s and wind up losing their

4   jobs, losing their families, losing their health, losing their

5   cars, and they get to a point where they can never recover.

6      I was actually fortunate that I had the surprise of the

7   FBI knocking on the door and jolted me into realizing that I

8   had a serious problem that I needed to take care of.

9      The only time to take care of a problem like this is the

10  present.  So I handled it in the best way I could, and that

11  was to simply stop drinking, which was probably one of the

12  hardest things in my life to do, right up next to telling my

13  parents that the allegations were true and sitting down and

14  actually talking with them and letting them know that I

15  actually had created the trouble, the very serious trouble

16  that I was and currently am in.

17     I had a lot of stuff written down that I wanted to cover,

18  but I guess I can pretty much sum it up by saying that I have

19  always been a good person.  I fell into a position in my life

20  that I never, never could have conceived of being in.  Now

21  that I am beyond that, I am going to continue being a good

22  person.  And I want to thank you for your time.

23     Thank you.

24          THE COURT:  Mr. Gourde, let me ask you this:  Are you

25  saying now, you seem like the main emphasis that you were

1  placing was on the drinking and what was going on, is that

2  what you are saying was the reason why you are here before

3  this Court?

4          THE DEFENDANT:  No, sir.  No, Your Honor.  The

5  drinking wasn't the primary reason.  I think you've seen in

6  the sentencing memorandum that I have a severe sleep disorder.

7  It's called sleep apnea, and --

8          THE COURT:  Are you saying that between the sleep

9  apnea and the drinking, that otherwise this wouldn't have

10 happened?  Am I understanding you correctly?

11         THE DEFENDANT:  In all honesty, yes.  If I had

12 actually been sleeping like a normal person sleeps and not

13 drinking, I never would have allowed myself to get in this

14 position.  Drinking and -- do you know anything about sleep

15 apnea?

16         THE COURT:  I think I understand it.

17         THE DEFENDANT:  Okay.  Basically I hadn't been

18 getting REM sleep --

19         THE COURT:  I guess what I am trying to understand,

20 why would having trouble sleeping send you in one direction?

21 Why couldn't you maybe just, I don't know, play computer games

22 all night because you can't sleep?

23         THE DEFENDANT:  I don't understand the position I was

24 in at that time.  I cannot put it into words, because it's a

25 position that no normal person would have ever been in.

1    Basically, I was at the edge of losing my mind.

2            THE COURT:   I guess what I am trying to understand

3    is, are you saying that there is not a problem here?  You just

4    need somebody to, just like the report says, address the sleep

5    problem and drinking problem and everything is fixed?  Is that

6    what you are saying?

7            THE DEFENDANT:   As far as myself?

8            THE COURT:   Reflecting on the charge now.

9            THE DEFENDANT:   I am sorry?

10           THE COURT:   Reflecting on the charge as to why you

11   are here and what you are charged with.  You are not here

12   because you can't sleep and didn't drink?

13           THE DEFENDANT:   No, Your Honor.  As to your comment

14   on everything's fixed, no, everything won't be fixed until you

15   actually pass sentence on me and determine what I need to do

16   to repay my debt.

17           THE COURT:   Maybe you are not understanding exactly

18   what I am saying.  This whole thing is indicating a tendency

19   that you were doing and involving yourself in something that

20   you like to do.

21           THE DEFENDANT:   No, I don't believe I was involved in

22   something I like to do.

23           THE COURT:   Okay.  Mr. Moon, let me ask you, anything

24   from what you've heard that would cause you to want to address

25   or alter your report in any way?

1          PROBATION OFFICER:  No, Your Honor.  Probation feels

2     the sentence of the low end of the guideline range is the

3     appropriate disposition in the matter.

4          THE COURT:  Anything else to add, counsel?

5          MR. FIEMAN:  No, Your Honor.  The only thing I would

6     add on the last point, Micah has been addressing his

7     propensity to look at this stuff with his counselor.  I think

8     what he was trying to distinguish is he definitely has

9     problems.  That's the reason he's going to counseling every

10    time, two or three times a month to address what was his

11    interest in looking at this stuff.

12       I think what he was trying to convey to the Court is that

13    what's driving him is not a continuing taste to look at this

14    stuff, but there are other problems which he's addressing in

15    counseling which made him responsible and willing to look at

16    this stuff.

17         THE COURT:  I am looking at the reports that I have.

18    They all seem to deal with the sleep problem.  Is there

19    something that I missed?

20         MR. FIEMAN:  Your Honor, the only thing I put in was

21    a confirmation from his counselor that, just from Northwest

22    Psychological Resources, on their final report confirming that

23    he has been attending this session since June 11, 2002 with

24    Randy Hurst.  This is not alcohol treatment.  And the sleep

25    disorder treatment is separate also.  This is to deal with the

1    issues and to control his behavior in terms of the specific

2    charges.

3         THE COURT:  But it doesn't say anything --

4         MR. FIEMAN:  Your Honor, his counselor did not want

5    to go further into the nature of the treatment I guess because

6    of his concerns about doctor-patient confidentiality, except I

7    think his assurance about good to excellent progress to show

8    that he's dealing with the issue.

9         THE COURT:  I am asking you those questions for the

10   obvious reason because you are saying somehow the conduct is

11   outside of the heartland, and I am not seeing that.

12     I understand -- I give him all the credit for trying to

13   get his problem under control and all of that, everything that

14   may contribute to the problem, but in order to say it is

15   outside the heartland, I need something to compare it to and I

16   am not finding that.

17     The Court, using its discretion, discretion should be

18   sound discretion, not just willy-nilly bring about something,

19   and I am not seeing that.

20        MR. FIEMAN:  I understand, Your Honor.  I think the

21   comparison can be made on your own with experience with these

22   cases.

23     Frankly, I think the strongest argument, and obviously the

24   one that emphasizes this is aberrant behavior in terms of his

25   overall life, and the Ninth Circuit is clear that you look at

1  the totality of the defendant's life, and most importantly,

2  Your Honor, I think what is significant --

3          THE COURT:   You mean as to aberrant behavior?

4          MR. FIEMAN:   Yes.

5          THE COURT:   Are you saying -- well, I don't know.

6  Then walking would be aberrant behavior, I suppose, if you

7  just pick out an item what you've been doing, and then doing

8  it all your life and there is nothing different about the way

9  you do it.  It seems to me that aberrant behavior has to be

10 something that you totally didn't believe was going to happen

11 and something that's not continually going on and on and on.

12 Otherwise, that term wouldn't make much sense, at least to me,

13 it wouldn't.

14         MR. FIEMAN:   This wasn't continuously going on and

15 on.

16         THE COURT:   We are talking about a period of time and

17 we are talking images here.  I believe they were talking -- I

18 don't remember the exact number, but they were numerous, so it

19 is not like something in one setting.

20         MR. FIEMAN:   Since it is entirely within your

21 judgment, I am not trying to argue that, but the courts have

22 been very clear, even something that happened over a period of

23 a month or two, if it is within the context of the defendant's

24 life of being an unusual set of incidents.  I think what's

25 really hard here is the argument I have made for post-offense

1  rehabilitation.

2       THE COURT:  I give him credit for that, trying to do

3  things.  Basically, it is an expectation, I suppose, when you

4  are out of jail and you are waiting on sentencing, that you

5  stay out of trouble.  Isn't that kind of an expectation?

6       MR. FIEMAN:  With all due respect, it is much more

7  than staying out of trouble involved with what Micah's been

8  doing on his own for the past year.

9       THE COURT:  I understand that, and I see about the

10 sleep matter, but then I see about the last letter that you

11 pointed out, it tells me absolutely nothing.

12      MR. FIEMAN:  It does tell you he has, on his own

13 initiative, got himself into counseling and continued with it.

14      THE COURT:  He's trying to do something about it, and

15 that's good.  That's good.  But I suppose if you take the

16 position that you are presenting here, without more, everybody

17 that walks in here that's the same presentation.

18   I am looking for something to give the Court, and I always

19 look for these reasons to say something else should be added

20 to it.  You have to give me something to say that that's a

21 legitimate approach or way to go, and I am not finding that

22 here.

23   I am not finding anything to get us outside the

24 guidelines.  I think we are in there.  I don't think the facts

25 support it.  The discretion should be exercised, but I believe

1    it should be sound discretion.

2         MR. FIEMAN:  When I state to the Court that I have

3    yet to have a client who has taken the steps that Micah has --

4         THE COURT:  I understand.

5         MR. FIEMAN:  To me, this is not only an exception

6    case but a unique case in my experience.  So I am not

7    saying --

8         THE COURT:  I can appreciate all of what you are

9    saying.  I am not saying your argument -- I am just saying

10   it's ideal; it's what probation, what everything is all about,

11   to get him back on the right track so he doesn't have this

12   problem again.  He says that's the way he's going, and this is

13   what we are talking about is over and above in dealing with

14   that situation.

15     I am saying then there should be some basis that the Court

16   can say, this is the reason I should do what you are asking

17   this Court to do.  I am saying I am not finding that.  That's

18   all I can say.  I don't want him to stop doing what he's

19   doing.  That's what the Court wants him to do.  I hope I never

20   see him again under these circumstances.  But that's not the

21   issue that the Court is deciding here today, and that's the

22   problem.

23     So what I am saying is, I see no reason to depart based on

24   these matters that have been stated here.  I am just not

25   finding that it is sufficient enough, at least in my

1  estimation.  So I decline to exercise that discretion in doing

2  so.

3      So the Court will make the finding that the calculations

4  are correct by the probation department.  That it would carry

5  an imprisonment range of 21 to 27 months, but I think it

6  should be on the low end of that as has been recommended, so

7  that's where I will place him.

8      So the sentence will be, Mr. Gourde, that you will -- and

9  I will deal with the other issue that's been raised -- 21

10 months.

11     A period of supervision will be three years.

12     No fine will be imposed under the circumstances of this

13 case, but the special assessment of $100 will be imposed.

14     The special conditions to be imposed will be that you

15 cooperate in the collection of DNA by the probation

16 department.

17     That you not possess any firearm or any other dangerous

18 weapons.

19     That you submit to mandatory drug testing.

20     If it is determined by the probation department that you

21 should be involved in a program for the treatment of narcotic

22 addiction, drug dependency, or substance abuse, that you are

23 to enroll in that.

24     You are to submit to a search of your person, your

25 residence, your vehicle, your property of all kinds to make

1  sure you are in compliance.

2      You are to participate in a mental health/sexual offender

3  treatment program, which may include psychosexual evaluations

4  and sexual deviancy programs, those types of things that

5  probation will be working with you in that.

6      As part of your sexual offender treatment, you are to be

7  involved in group sessions, group therapy.  And all of this is

8  left by the therapist to be in charge as to how that will be

9  operated.

10      You are to submit to a polygraph examination, which would

11  include physiological testing, what they refer to as a

12  plethysmograph, if necessary, to see if they can determine

13  sexual orientation, patterns of sexual arousal and those kinds

14  of things as part of this program.

15      You are not to have unsupervised contact with minor

16  children under the age of 18 without going through the

17  probation department.  I expect them to use common sense with

18  that, when we are talking about members of the family, family

19  reunions and those kind of things.  But anything that would

20  give rise to a problem area that may cause them to say you are

21  in violation of your probation, I would ask you if you

22  encounter a situation like that, that you would discuss it

23  first with probation, or at least your attorney, whatever the

24  case, to make sure you do not put yourself in the position of

25  being in violation.

1      You are not to possess or use any pornographic material of

2   any type.

3      You are to follow all other lifestyle restrictions,

4   treatment requirements that may be imposed by the therapist as

5   to how you are to conduct your life, avoiding risk of

6   situations that would give rise to these problems, like not

7   residing and going to places where minors are known to

8   frequent and that kind of thing that may give them cause to be

9   concerned.

10      You are consenting also to them monitoring your computer,

11   your hardware, software, allowing them to make evaluation of

12   your computer use and any matters that may come through your

13   computer.  And they will be giving you requirements that they

14   expect you to follow in that.

15      You also will let them inspect your personal computer that

16   may be owned and operated by you, notify them of any software

17   owned or operated by you, and anything you intend to purchase

18   in terms of software acquisition.

19      Also provide them, if necessary and requested, financial

20   information, including authorization to make credit checks,

21   see your federal income tax return and that sort of thing.

22      You are not to incur any substantial new credit without

23   the probation department being advised before the purchase.

24      The Court, as I have indicated, is making a finding that

25   you do not have to pay a fine, but the special assessment will

1  be imposed.

2      Any other conditions I should be concerned about?

3          MS. FREEMAN:  With respect to the forfeiture, I think

4  Your Honor needs to make an oral finding on the record.

5          THE COURT:  I believe you agreed to that.

6          MR. FIEMAN:  That's correct, Your Honor.  I have no

7  objection to the forfeiture.

8          THE COURT:  All right.  Then I will sign that.  I

9  would also sign the judgment as to the sentence in this

10  matter, if you have one prepared.

11          MS. FREEMAN:  I did bring one today with me, Your

12  Honor.

13          MR. FIEMAN:  Your Honor, just in terms of the

14  sentence, we would just like to note on the record in the

15  sentence that we do request the drug and alcohol treatment

16  program.  I understand it is up to the BOP, but it's sometimes

17  helpful to have that as a recommendation in the sentence, just

18  so he continues with his progress in terms of staying off

19  alcohol.

20          THE COURT:  I don't see a problem with that.

21          MR. FIEMAN:  We will also -- again, it's sometimes

22  helpful to the Bureau of Prisons if we make a request on the

23  record if he is sent to the nearest -- if he qualifies for

24  minimum security, Sheridan, it is not something the Court can

25  rule on, but sometimes it's helpful if we have the

1  recommendations.

2          THE COURT:  That's fine.  The other issue we will

3  decide before that is while the appeal is pending --

4          MR. FIEMAN:  Yes.  With regards to the sentence

5  imposed, do you want to take up the issue of bail pending

6  appeal?

7          THE COURT:  We will take it up as soon as we sign the

8  order.

9      Let me have the government speak to that when you are

10  through.

11          MS. FREEMAN:  Yes, Your Honor.

12          THE COURT:  Of course, Mr. Gourde, I am sure that

13  Mr. Fieman has told you now that where you are requesting to

14  go, it may not be available or open, but the Bureau of Prisons

15  will determine where you actually end up.

16          THE DEFENDANT:  Okay.  Your Honor --

17          THE COURT:  Yes.

18          (Defendant had discussion off the record with his

19  attorney.)

20          MR. FIEMAN:  That's okay, Your Honor, I was able to

21  address the question.

22          THE COURT:  All right.

23          MR. FIEMAN:  Thank you, Your Honor.  We've reviewed

24  the judgment and order, and we have no corrections or

25  objections.

1              THE COURT:  So with the understanding that it

2    comports with the Court's judgment in the matter, I will sign

3    the order of forfeiture as well as the judgment.

4              This means, Mr. Gourde, this is the sentence that you

5    will be under.  If you feel for any reason now that I have

6    imposed an illegal or an unconstitutional sentence upon you,

7    you have a right to appeal this judgment.

8              Since I have signed it today, if you intend to do that,

9    you need to do it within 10 days of today's date.

10             All right.  The other issue, of course, is whether this

11   defendant should be out pending the appeal.  As you recall, it

12   was a conditional plea as I recall.  Any issue on that?

13             MS. FREEMAN:  That is correct, Your Honor, it is a

14   conditional plea.  I do oppose the motion for bail pending

15   appeal.  Title 18, Section 3143, Subsection (b), describes the

16   factors the Court may consider and the findings to be made by

17   the Court in determining whether or not to grant such a

18   request.

19             As the Court knows, the statute presumes detention

20   after a sentencing pending an appeal by the defendant.

21        The statute presumes detention unless the judicial officer

22   finds by clear and convincing evidence that -- the factor

23   regarding flight risk and danger to the community, and there

24   must be a finding that the appeal is not for the purpose of

25   delay and raises a substantial question of law or fact likely

1  to result in reversal or an order for a new trial or a

2  sentence that does not determine imprisonment or a reduced

3  sentence.

4      Perhaps I am biased, but I don't see that the question of

5  law in this matter is likely to result in reversal or an order

6  for a new sentencing of any kind, so I don't think the

7  defendant can meet the burden under the statute.

8          THE COURT:  Okay.

9          MR. FIEMAN:  I don't think the government is

10 seriously contesting the fact that he is not a flight risk and

11 not a risk to the community.  That's been argued and certainly

12 he's demonstrated he meets those two factors unless there is

13 some concern about that.  He's done exceptionally well with

14 Pretrial Services.

15     The Montoya case that I cited in my application, the Ninth

16 Circuit very clearly held that all that is required is the

17 movant, the defendant, show that there is a substantial

18 question of law not required to show that they are likely to

19 gain a reversal based on the record that exists at the time

20 the application is made.  So that there is a fairly

21 substantial question of law.

22     Quite frankly, Your Honor, this was a novel and very close

23 question.  The Court ruled as it did.  Obviously, we respect

24 to that decision, I do frankly intend to vigorously appeal it

25 because whatever ruling the Court made, there were issues that

 1  simply have not been addressed previously.

 2      We rely on Ninth Circuit precedent to try and set up sort

 3  of a continuum of what's required, but we are carving out new

 4  areas of law with these cases.

 5      The FBI and Customs frankly have been funded and mandated

 6  by DOJ to take an aggressive posture toward these cases.  We

 7  are seeing new types of cases based on new types of warrants

 8  all the time.

 9      One issue that has been very clearly mentioned today is

10  the question of downloading.  This is not a matter of for

11  purpose of delay, this is a case that's going to the Ninth

12  Circuit.  I have not made this request in any other case.  I

13  believe it will be vigorously litigated, and I think that's

14  all that we are required to show in regard to the third

15  factor.

16      The only thing I would add to the side, to the extent the

17  Court has found Mr. Gourde is doing the things that he needs

18  to be doing, in terms of being rehabilitated and complying

19  with what would be required at the other end for supervised

20  release, I really don't see the harm in allowing him to

21  continue doing that for the next six to nine months until we

22  get a decision.  He will continue in counseling.  He is

23  dealing with the alcohol problem.  He has complied fully with

24  Pretrial Services.  He's got a good job that he goes to every

25  day.

1    I just don't see the harm.  It is an unusual request

2  because we seldom have an issue of such novel facts regarding

3  computer searches.  And it is going to be an interesting

4  appeal one way or the other.

5    So I really hope the Court will grant the motion and allow

6  him to continue doing what he's doing for the next six to nine

7  months.  The sentence is out there for him.

8    THE COURT:  Let me ask this question:  Is he being

9  supervised now for any reasons by Pretrial Services?

10   MR. FIEMAN:  Just that it was a condition to his

11  pretrial release.  Are you checking in?

12   THE DEFENDANT:  I call in every night for a random

13  drug test and --

14   THE COURT:  So they do have a condition attached to

15  your release?

16   Mr. Moon, do you have any evidence -- I don't have that

17  before me, but I am not finding -- it doesn't sound like

18  there's any argument here about flight or danger.  I don't see

19  that.  He is doing what I -- I am seeing under the

20  circumstances of this case and what I know about this, having

21  handled the suppression hearing, I see no reason not to leave

22  him out under the same conditions he's under now until that

23  issue is finally resolved.

24   MR. FIEMAN:  Thank you, Judge.

25   THE COURT:  I think that's the fair thing to do in

1  this case.

2          MS. FREEMAN:  Thank you very much.  In any event, on

3  page 2 of the judgment, if you could, Your Honor, I need you

4  to check the box which says to "surrender for service of

5  sentence", I think it would be appropriate to mark the box as

6  designated "by the probation office."

7      Is that how it would work in this case?

8          PROBATION OFFICER:  That's correct.

9          THE COURT:  Where?

10          MS. FREEMAN:  If you look at page 2 on the bottom on

11  the left-hand side, there should be a box which says "The

12  defendant shall surrender for service of sentence."

13          THE COURT:  Right.

14          MS. FREEMAN:  There are three blocks.

15          THE COURT:  Right.  Okay.

16          MS. FREEMAN:  I did not mark that earlier because I

17  wanted to wait until we addressed this issue.

18          THE COURT:  Okay.  I would assume that probably

19  either probation or pretrial would be making a notification

20  here, not the Marshals.  So I am going to check and give them

21  the obligation to do that.  We will know what that is once the

22  Circuit has done their thing.

23          MR. FIEMAN:  Thank you, Your Honor.

24          MS. FREEMAN:  I am assuming, Your Honor, you are

25  continuing to order the previous conditions of release.

1          THE COURT:  Correct, that's what I said, under the

2    same conditions he's under now.

3       All right.  Anything else?

4          MR. FIEMAN:  No, thank you, Judge.

5          THE COURT:  All right.  That's the order.

6          THE CLERK:  All rise, court is in recess.

7          (Proceedings concluded.)

8                    *    *    *    *    *

9                C E R T I F I C A T E

10

11     I certify that the foregoing is a correct transcript from

12   the record of proceedings in the above-entitled matter.

13

14   /S/  Teri Hendrix_____          March 23, 2006

15   Teri Hendrix, Court Reporter                Date

16

17

18

19

20

21

22

23

24

25